# In the United States Court of Federal Claims

No. 11-867C

(Filed Under Seal: March 5, 2012)

Reissued: March 21, 2012[1]

_____

| | |
|---|---|
| BOSTON HARBOR DEVELOPMENT PARTNERS, LLC., | * <br> * <br> * <br> * |
| Plaintiff, | * <br> * |
| v. | * <br> * <br> * |
| THE UNITED STATES, | * <br> * <br> * |
| Defendant, | * <br> * |
| and | * <br> * |
| EMERALD CORPORATE CENTER, LLC, | * <br> * |
| Defendant-Intervenor. | * |

Preaward bid protest; Review of corrective action; Claim that failure of agency to terminate prior lease will bias reprocurement; Lack of standing; Case dismissed.

_____

**ORDER**

_____

*David Scott Black*, Holland and Knight, LLP, McLean, VA, for plaintiff.

*William James Grimaldi*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

*Diana Parks Curran*, Curran Legal Services Group, Inc., Johns Creek, GA, for defendant-intervenor.

**ALLEGRA, Judge:**

_____

[1] An unredacted version of this opinion was issued under seal on March 5, 2012. The parties were given an opportunity to propose redactions, but no such proposals were made. Nonetheless, the court has incorporated some minor changes into this opinion.

In this preaward bid protest case, the General Services Administration (GSA) awarded a contract to Emerald Corporate Center, LCC (ECC or defendant-intervenor) for the construction and lease of a new campus for the Federal Bureau of Investigations (FBI) in Boston, Massachusetts. After Boston Harbor Development Partners (Boston Harbor or plaintiff) protested this award with the General Accountability Office (GAO), GSA indicated that it would take corrective action and GAO dismissed the appeal. But, that corrective action did not include terminating the lease that GSA had entered into with ECC as part of the protested procurement. Plaintiff complains that GSA's failure to cancel the lease will bias the agency's evaluators toward awarding ECC the contract again and, in a proposed solution to this problem, seeks a declaration that the lease is void. The United States and ECC have moved to dismiss this protest under RCFC 12(b)(1) for lack of jurisdiction, asserting, *inter alia*, that Boston Harbor lacks standing. For the reasons that follow, the court **GRANTS** these motions.[2]

## I.      Background

To meet the FBI's need for additional space, on April 7, 2008, GSA published a Request for Expression of Interest for the construction and lease of a new FBI campus in the Boston, Massachusetts area. Several parties responded. The FBI evaluated the security of each of the seven proposed locations and found that five met its requirements – these included sites proposed by ECC and Boston Harbor. On July 28, 2008, GSA issued Phase I Solicitation for Offers (SFO) No. 2818A to the representatives of the approved sites, seeking a "dedicated campus facility for the" FBI. Of the five offerors invited to bid, only three submitted proposals – ECC, Boston Harbor, and a third company. GSA's Source Selection Evaluation Board (SSEB) evaluated these proposals and visited each of the offered sites to determine if they satisfied the SFO's requirements. Following this evaluation, ECC received an overall score that was slightly higher than that given to Boston Harbor.

On January 15, 2009, GSA distributed Phase II SFO No. 2818A to the three Phase I offerors, requiring the offerors to submit price and technical proposals; only ECC and Boston Harbor submitted Phase II proposals. The Phase II SFO stated that the government would "select for award the proposal that satisfies all of the minimum requirements set forth in the SFO and, consistent with the Phase II technical evaluation factors, represents the best overall value to the Government." The Phase II proposals were evaluated by a five person SSEB, which identified issues for clarification in both proposals. From November 2009 to April 2010, GSA conducted discussions with both offerors and received a series of proposal revisions, ultimately leading to each offeror submitting a final proposal. The SSEB reviewed the final proposals and, on November 10, 2010, concluded that ECC's proposal represented the best value to the government based on its higher Phase I and II scores, as well as its lower price. On December 1, 2010, Boston Harbor received notice that GSA had selected ECC's proposal.

---

[2]   Owing to the urgent need of the parties for a ruling on this matter, the court's recitation of the facts and law is necessarily brief.

On December 3, 2010, Boston Harbor protested the award to GAO, alleging that certain errors and illegalities had led GSA to select ECC.  On December 10, 2010, Boston Harbor filed a supplemental protest.  Among the allegations in this protest, plaintiff claimed that:  (i) ECC's proposal should have been scored as a capital lease (rather than as an operating lease); (ii) GSA incorrectly calculated the present value of ECC's proposal in its price analysis; and (iii) ECC's proposed site did not meet the minimum requirements of the solicitation and thus was ineligible for the award.  On December 21, 2010, GSA notified GAO that it had identified an error in its present value calculations and intended to recalculate the present value of the proposed sites and assign revised Phase II scores.  Two days later, GAO dismissed Boston Harbor's protest as moot.

Subsequently, GSA's head of contracting activity appointed a new SSEB to conduct a *de novo* evaluation of the Phase II offers, and also replaced the contracting officer and source selection authority (SSA) that were to make the new award decision.  After the Phase II reevaluation, both offerors' technical scores were lower, but Boston Harbor's score fell dramatically, leaving a much greater gap between its technical score and that of ECC.  While the recalculated present values resulted in a much smaller gap between the price of the two proposals, ECC's proposal remained the less expensive option.  The new SSEB recommended that EEC's proposal be accepted, and the new SSA agreed that ECC's proposal represented the best value to the government.  Based on this determination, on September 23, 2011, GSA executed a formal lease with ECC; that lease did not contain a termination for convenience clause.

On September 26, 2011, GSA notified plaintiff that ECC had been selected again for the award.  On October 6, 2011, plaintiff protested the second award to GAO, raising allegations nearly identical to those presented in its first protest.  On November 18, 2011, GSA filed a notice of corrective action, stating that it "will re-evaluate the Phase I offers and Phase II as necessary as a result of the Phase I evaluations" and "scrutinize its price evaluations."  On November 21, 2011, plaintiff opposed dismissal of its second protest due to fears the outstanding lease with ECC would bias GSA's reevaluation.  But, that same day, GSA assured GAO that "the agency will abide by the outcome of the new evaluation, notwithstanding any implications for the agency of doing so."  On November 22, 2011, GAO dismissed plaintiff's second protest as "academic" in light of GSA's proposed corrective action.

On December 9, 2011, plaintiff filed a complaint in this court asking that, prior to GSA's reevaluation of the two proposals, the lease be declared illegal and void *ab initio*. On December 15, the court granted ECC's motion to intervene.  On January 18, 2012, plaintiff filed its motion for judgment on the administrative record.  On January 31, 2012, defendant and defendant-intervenor filed motions to dismiss plaintiff's complaint under RCFC 12(b)(1) and, alternatively, cross-motions for judgment on the administrative record.  Briefing of these motions was completed on February 14, 2012, and oral argument was held February 21, 2012.

## II.    DISCUSSION

In its motion for judgment on the administrative record, plaintiff contends that the existing lease between GSA and ECC creates strong financial incentives for GSA to award the contract to ECC a third time, depriving plaintiff of the opportunity to compete on a level playing field.  For their part, defendant and defendant-intervenor argue that this court lacks jurisdiction over plaintiff's complaint, for a variety of reasons, among them that plaintiff lacks standing.  In that regard, defendant and defendant-intervenor argue that plaintiff is merely speculating as to how the agency will approach the reprocurement here and has not alleged an injury that can be addressed through judicial relief.

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed."  *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 549, 554-55 (2007).  In particular, the plaintiff must establish that the court has subject matter jurisdiction over its claims.  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  Here, defendant claims that jurisdiction is lacking because, *inter alia*, plaintiff lacks standing to challenge the agency's corrective action on the basis that the agency's failure to cancel the existing lease may bias its award of a new lease in the pending reprocurement.

This court has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A)); *see also Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  In addition, "[t]he plaintiff in a bid protest must show that it has standing to bring the suit."  *L–3 Global Commc'ns Solutions, Inc. v. United States*, 82 Fed. Cl. 604, 608 (2008) (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).[3]  "Because standing is jurisdictional," the Federal Circuit has stated, "lack of standing precludes a ruling on the merits."  *Media Techs. Licensing LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003).

"The pivotal element of standing in a bid protest is whether a protestor qualifies as an 'interested party' under [section] 1491(b)(1)."  *Rhino Corps Ltd. Co. v. United States*, 87 Fed. Cl. 481, 485 (2009).  The Federal Circuit has construed the term "interested party" as synonymous

---

[3]    Although the Court of Federal Claims, an Article I court, "applies the same standing requirements enforced by other federal courts created under Article III," *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003), the Federal Circuit has determined that 28 U.S.C. § 1491(b) "imposes more stringent standing requirements than Article III."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

with the term "interested party," as defined in the Competition in Contracting Act, 31 U.S.C. § 3551(2)(a).  *See Am. Fed. of Gov't Emps.*, 258 F.3d at 1302; *see also Avtel Servs. Inc. v. United States*, 501 F.3d 1259, 1261 (Fed. Cir. 2007).  In order to have standing as an "interested party," a protester must satisfy a two-part test.  First, the protester must demonstrate that it is an actual or prospective bidder.  *Rex Serv. Corp*, 448 F.3d at 1307; *see also MCI Telecomm. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989) (noting that "one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation").  Second, the protester must demonstrate that it has a direct economic interest in the procurement.  *Rex Serv. Corp*., 448 F.3d at 1307; *see also Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008).

In order to establish a direct economic interest in the procurement, a protester must demonstrate prejudice.  *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("prejudice (or injury) is a necessary element of standing").  The way that a protestor does this depends upon the nature of the protest.  In post-award bid protests, a protester must show that it had a "substantial chance" of receiving the contract.  *Rex Serv. Corp.*, 448 F.3d at 1308.  By contrast, in preaward bid protests "there have been neither bids/offers, nor a contract award," precluding the court from applying the "substantial chance" standard.  *Weeks Marine, Inc.*, 575 F.3d at 1361.  Instead, the Federal Circuit has indicated that a protestor must allege a "'non-trivial competitive injury which can be addressed by judicial relief.'"  *Id.* at 1362 (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)); *see also MORI Assocs., Inc. v. United States*, 2011 WL 6409124, at *8 (Fed. Cl. Dec. 15, 2011).  This standard, the Federal Circuit has recently noted, "strikes the appropriate balance between the language of § 1491(b)(1) . . . . and Article III standing requirements."  *Weeks Marine, Inc.*, 575 F.3d at 1361.  The court, therefore, must consider whether Boston Harbor has alleged "a non-trivial competitive injury which can be addressed by judicial relief."  The court concludes that it has not.

Plaintiff claims that if the existing lease is not cancelled before the reevaluation of the offers, the agency likely will select the current lessee to avoid the costs associated with cancelling the lease.  Plaintiff argues that the existence of this lurking obligation will create bias on the part of the agency evaluators, causing them to conduct the procurement process in bad faith and ultimately costing plaintiff the new award.  As should be obvious from the way it frames this claim, however,  plaintiff is not alleging a competitive injury that has or will imminently occur, but rather raises an injury that may occur – or not.  This claim is purely conjectural – plaintiff offers no evidence from the earlier stages of this procurement suggesting that the agency employees involved here are biased against it in the slightest.[4]  Indeed, there is the prospect – which plaintiff does not deny – that plaintiff will prevail on the reprocurement.

---

[44]   *See Outdoor Venture Corp. v. United States*, 100 Fed. Cl. 146, 154 (2011) (no standing where "harm that [protestor] itself describes as something that 'may' occur is neither concrete and particularized nor actual or imminent"); *Eskridge Research Corp. v. United States*, 92 Fed. Cl. 88, 94 (2010) (holding that claims "regarding speculative and potential improprieties in the re-evaluation process" were not ripe for review); *see also Allen v. Wright*, 468 U.S. 737,

Plaintiff's assertion that the GSA evaluators will be biased if the lease is not cancelled contradicts a fundamental tenet of Federal procurement law, *to wit*, that "government officials are presumed to act in good faith."  *Holmes v. United States*, 657 F.3d 1303, 1319 (Fed. Cir. 2011); *see also Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1288 (Fed. Cir. 2010) ("As an initial matter, government officials are presumed to act in good faith.").  Absent countervailing indications, this presumption ought to be at its zenith where the government has yet to act.  In determining prejudice, the court thus will not presume that GSA will act in bad faith.  Instead, the court is "required to assume that the Government [will] carry out the corrective action in good faith."  *Eskridge*, 92 Fed. Cl. at 95.  Moreover, this is not a case in which a challenge to the corrective action would be untimely under cases like *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) and *CRAssociates, Inc. v. United States*, 2011 WL 7069610, at *12 (Fed. Cl. Dec. 23, 2011).  Unlike in those cases, the injury alleged here (a biased evaluation) has not occurred yet, is far from imminent, and, indeed, may never occur.[5]  In that circumstance, plaintiff lacks standing to challenge the agency's decision not to cancel the lease with ECC.  *See Weeks Marine*, 575 F.3d at 1362-63 (discussing the relevance of this waiver point on the preaward standing inquiry).

A contrary ruling would constitute a broad expansion of this court's bid protest jurisdiction.  Agencies often incurs costs when they are forced to terminate a contract for convenience as the result of a sustained protest or a decision to take corrective action.  And, when they do, they are required by the FAR to reimburse the terminated contractor for the portion of the contract performed and other reasonable charges.  *See, e.g.*, 48 C.F.R. § 52.212-4(l); *see also Int'l Data Products Corp. v. United States*, 492 F.3d 1317, 1324 (Fed. Cir. 2007).  These outlays, which can be significant, can be effectively diminished if the agency personnel evaluating a reprocurement give the new contract to the prior awardee – thereby allowing the agency to recoup some its "investment" by avoiding paying certain charges twice.  If plaintiff is

---

754 (1984) ("[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.").

[5]  In an effort to give this allegation some legal corporeality, plaintiff claims that, in actuality, the existence of the lease creates an apparent conflict of interest for the agency evaluators that violates FAR 1.301-1.  That regulation indicates that procurement officials should "avoid strictly . . . even the appearance of a conflict of interest in Government-contractor relationships."  *Id.*  But, this regulation does not suggest that every advantage that the public might conceive as presenting a conflict of interest must be addressed.  Rather, the Federal Circuit has held that for "an appearance of a conflict of interest to exist, a government official must at least appear to have some stake in the outcome of government action influenced by that individual."  *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1336 (Fed. Cir. 2004).  Plaintiff has not adequately alleged such a connection here.  Nor has plaintiff formulated any argument that an organizational conflict of interest under FAR 9.505 is present here.  *Cf. Jacobs Tech., Inc. v. United States*, 100 Fed. Cl. 179 (2011); *see generally, NetStar-1 Gov't Consulting, Inc. v. United States*, 101 Fed. Cl. 511 (2011).  Accordingly, Boston Harbor's blithe invocation of the conflict-of-interest regulation adds no concreteness to the "injury" it claims.

right, then, in all these situations, a protester should be able to obtain an injunction from this court requiring an agency to take additional steps to counteract any bias that might creep into the reprocurement.  What those steps should be, short of disqualifying the original awardee, are not apparent, particularly because plaintiff argues that "the shadow cast by the existing lease" falls over the entire agency, and not merely the  evaluators previously involved.  Fortunately, that is not the law – and plaintiff cites no cases on point to the contrary.  Try as it might, plaintiff has failed to distinguish these common situations from the circumstances presented here.  Indeed, in commendable candor it admits that the financial exposure in this case might be less than an agency would incur in paying termination for convenience costs for a larger procurement.  In sum, plaintiff's argument on this count proves too much.

Finally, Boston Harbor assumes that if this court has jurisdiction over its claim and sustains that claim, it can fashion an effective remedy.  But, that is far from obvious and, indeed, likely not the case.   Plaintiff has failed to explain how declaring the lease invalid now – nearly six months after it was executed – will insulate the GSA from liability, so as to leave the objectivity of the GSA evaluators "unimpaired."  While declaring the lease invalid *ab initio* might avoid certain forms of breach damages, such as expectation damages, it likely would expose GSA to other forms of contractual or pseudo-contractual damages.  *See e.g.*, *Land Grantors in Henderson, Union, and Webster Counties, Ky. v. United States*, 64 Fed. Cl. 661, 708 (2005) (suggesting that restitution damages would be available in the case of a void contract).  Accordingly, if the threat of having the agency pay such damages is viewed as inexorably tainting the objectivity of the GSA evaluators – a point which this court contests – there is nothing the court can do to remove that taint now, as the prior signing of the lease has already created this exposure, such as it is.  This is yet another reason – albeit not the prime one – why Boston Harbor has not alleged an "injury which can be addressed by judicial relief."  *Weeks Marine*, 575 F.3d at 1361.

Plaintiff's alleged injury is neither actual or impending.  And even if it is, it cannot be remedied.  Accordingly, this court concludes that plaintiff lacks standing to challenge the propriety of the outstanding lease.[6]

---

[6]   It is worth noting that it is highly unlikely that plaintiff would prevail on the merits.  Plaintiff cites no precedent supporting its argument that GSA's lease with ECC should be deemed void *ab initio*.  The only circuit cases that have set aside (or reinstated) an existing award involve agency violations of statutes or regulations.  *See, e.g. Turner Constr. Co., Inc. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011); *Sys. App. & Tech., Inc. v. United States*, 100 Fed. Cl. 687, 716 (2011).  That did not occur here.  Plaintiff also cites *Johnson v. United States*, 15 Cl. Ct. 169, 174 (1988), in which the court found that no contract ever existed between the parties "because the illegality of plaintiff's revised offer and defendant's acceptance was plain, clear, obvious, and substantial."  But, assuming *Johnson* was correctly decided, no such illegality is apparent here.

**III.     CONCLUSION**

This court need go no farther.  Based on the foregoing, the court **GRANTS** defendant's and defendant-intervenor's motions to dismiss the complaint under RCFC 12(b)(1).  The Clerk is hereby ordered to dismiss the complaint.[7]

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[7]   The court intends to unseal and publish this opinion after March 20, 2012.  On or before March 19, 2012, each party shall file proposed redactions to this opinion, with specific reasons therefor.